UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

G. GRANT JOHNSON,

      Plaintiff,

    v.

HARTFORD CASUALTY INSURANCE
COMPANY,

      Defendant.

Case No. 15-cv-04138-WHO

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT, CLASS
CERTIFICATION AND EVIDENCE**

Re: Dkt. Nos. 36, 37, 38, 47, 53

## INTRODUCTION

A fire partially consumed plaintiff G. Grant Johnson's building in San Francisco, California. He alleges that defendant Hartford Casualty Insurance Company unlawfully underpaid him because it purposefully miscalculates "actual cost value" ("ACV") pay-outs by "depreciating all components of Plaintiff's structural loss without regard to whether the components were normally subject to repair and replacement during the useful life of that structure." Compl. ("Complaint") (Dkt. No. 1-1) ¶13. He also contends that Hartford underpays ACV by decreasing the sales tax component of ACV by the percentage of physical depreciation taken on the claim. Compl. ¶ 14. He asserts that these practices violate California Insurance Code section 2051, which prohibits the depreciation of the value of any components that are not "normally subject to repair and replacement during the useful life of that structure." Johnson also seeks to certify a class of similarly situated insureds.

Hartford opposes certification and seeks summary judgment because it paid Johnson more than the cost of the repairs he made to his building. Accordingly, it argues that he has not been damaged, lacks standing, and is not an adequate class representative. Hartford also argues that Section 2051 does not prohibit the depreciation of any item across-the-board, but rather requires

an investigation into each insured's claim on a case-by-case basis.

This Order grants Johnson's motion for class certification and denies Hartford's motion for summary judgment for the most part. Fundamentally, the injury suffered by Johnson is determined by Hartford's alleged failure to calculate his ACV claim in accordance with Section 2051, not whether he spent less than Hartford paid him for his claim. There are common questions for the class, such as whether Hartford depreciates certain building components in violation of Section 2051 when making ACV payments for partial losses, and there are material facts in dispute over the answers to those questions.

## BACKGROUND

### I.     FACTUAL BACKROUND

Johnson owns a commercial building at 321-329 Divisadero Street in San Francisco, California. Christopher Frost Declaration ("Frost Decl.") at ¶¶ 2-3, Exs. 1, 14, 15. The building was originally constructed in 1900 but has had several systems added or repaired since the completion of its construction, such as plumbing and electrical systems. Frost Decl. at ¶ 4, Ex. 1, 2. It was insured under Hartford's Business Owners Insurance Policy No. 57 SBA DO0133. Compl. ¶ 8. On December 20, 2013, it suffered damage from a fire on the property, causing a partial loss of the structure. Compl. ¶ 8.

Subsequent to the loss, Johnson submitted claims to Hartford. Compl. ¶ 12. His insurance policy describes two possible methods of payment: ACV and replacement cost value ("RCV"). Under the ACV option, Hartford would estimate the cost of repair and provide the insured with a payment in that amount, deducting a "fair and reasonable" amount "for the physical depreciation of the components of the building or structure that are normally subject to repair or replacement during its useful life." *Id*. This is based upon "the condition of the property at the time of the loss." *Id*. Under the RCV option (also called "replacement cost basis") Hartford would pay the insured the cost of the actual repairs made to the extent required to return the building to its approximate previous condition. Frost Decl., Ex. 3 ("Policy") at PLTF-JOHNSON004029.

Johnson alleges that Hartford underpaid him by depreciating and deducting items that are not "normally subject to repair or replacement," such as baseboard/trim, cement, doors, drywall,

1  electrical wiring, framing/rough carpentry, insulation, lath and plaster, marble, ornamental iron,

2  plumbing, and stairs.  Compl. ¶ 13.  He also asserts that Hartford "depreciated" the value of the

3  sales tax, meaning that in its policy pay-out, Hartford paid the amount of sales tax as applied to the

4  estimated cost of lost, depreciated items rather than the amount of sales tax as applied to the

5  estimated cost of replacement with new items.  Compl. ¶ 14.

6       Hartford made an ACV payment to Johnson of $731,000, of which he spent $644,000 on

7  repairs.  He asserts that he has yet to repair or reconstruct the third story of the property.   Dkt. No.

8  45, Exh. P at 3.

9       This Order addresses several motions.  Hartford moves for summary judgment and to

10 exclude the testimony of Johnson's expert, Eugene Peterson.  Johnson moves to certify a class.

11 He also seeks to strike portions of the Declaration of Christopher Frost, which was filed in support

12 of Hartford's motion for summary judgment, and evidence filed in support of Hartford's reply

13 memorandum for summary judgment.

**II.   EVIDENTIARY ISSUES**

14

15      Hartford brings a motion to exclude the testimony of Eugene Peterson, Johnson's expert.

16 Johnson brings two motions to strike, and objections to evidence, pertaining to the declaration of

17 Christopher Frost filed in support of the motion for summary judgment and evidence filed in

18 support of Hartford's reply memorandum.  It makes sense to address these issues before

19 addressing the merits of the motions for summary judgment and class certification.

20      **A.  Motion to Exclude the Testimony of Eugene Peterson**

21      Hartford alleges that the testimony of Eugene Peterson on the use of the software

22 Xactimate to depreciate building components should be excluded under Federal Rule of Evidence

23 702, Federal Rule of Civil Procedure 26(a)(2), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

24 509 U.S. 579 (1993).  It argues that:  (1) Peterson is not qualified as an insurance adjuster and has

25 no experience in the relevant area under California law; (2) Peterson's methodology is flawed

26 because Xactimate does not "calculate" depreciation; and (3) Peterson's disclosure is deficient

27 under the Federal Rules of Civil Procedure.

28      For expert testimony to be "relevant" under Federal Rule of Evidence 702, the expert must

offer "specialized knowledge" that will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Peterson's testimony does this. As Johnson points out: "Because Xactimate is a complex software used in Hartford's California claims, Plaintiff retained Xactimate expert Eugene Peterson to help explain how the software works in the context of this case." Oppo. to Mot. to Excl. 1. Johnson looks to Xactimate as a means of establishing his claims regarding depreciation; Peterson's knowledge how Xactimate functions is therefore relevant.

Hartford insists that Peterson is not qualified to offer an expert opinion about Xactimate because he is not an insurance adjuster. *See id*. at 4-5. I disagree. An expert is considered reliable where he has "a reliable basis in the knowledge and experience of the relevant discipline." *Daubert*, 509 U.S. at 593. As Johnson points out, Peterson's testimony is aimed at explaining the function of Xactimate. Peterson's testimony is not offered to readjust property losses. Oppo. to Mot. to Excl. 1. As a result, whether Peterson is an insurance adjuster is irrelevant.

Next, Hartford objects that Peterson's proposed methodology to determine classwide damages is flawed and should be struck. As an initial matter, "damage calculations alone cannot defeat certification." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975). Hartford's concern would be relevant if the offered methodology impugned Peterson's reliability as an expert witness, but it does not. Hartford argues that the information needed to determine the depreciation applied to an insured's adjustment is not contained in Xactimate but instead in an individual claim file. As a result, it suggests, Peterson's proposed methodology is flawed and reflects a lack of understanding of Xactimate. But in his Expert Report, Peterson explained that "[u]sing Xactimate and the Hartford database, it is feasible to efficiently determine where depreciation was taken and calculate and prove what damages, if any, specific insureds or groups of insureds are entitled to." Veroff Dec. ¶ 12, Ex. L at 10. Peterson's deposition confirms this: "I can tell from [Xactimate] . . . whether the adjuster put depreciation in it or not. You have to look at the claims folder to determine whether [the depreciation] was actually paid or not." Mot. to Excl. Reply Decl. ¶ 11,

Ex. 3 at 13.[1]

Finally, Hartford complains that Peterson's expert report is deficient under Federal Rule of Civil Procedure 26(a)(2). That rule requires experts to file a report which contains "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." Fed. R. Civ. P. 26(a)(2)(B)(v). Its purpose is to give opposing counsel "a reasonable opportunity to prepare for effective cross examination." Fed. R. Civ. P. 26, 1993 Advisory Committee Notes. Hartford raises two objections: Peterson has omitted cases in which he has testified as an expert; and his list of cases is too vague.

Hartford's first concern is that Peterson's disclosure does not include any cases subsequent to December 2015. Mot. to Excl. 7-8. Based on that, Hartford concludes that Peterson's disclosure is deficient. *Id.* But Johnson explains that Peterson has not testified as an expert since that date, so Peterson's disclosure is not deficient for that reason.

Hartford's second objection is equally unpersuasive: although there is room for improvement in Peterson's list of cases, it is not so deficient as to warrant exclusion. Peterson provided, and later supplemented, sufficient information to allow Hartford to identify the cases in which he testified as an expert. A court may exercise its discretion to admit expert testimony where the disclosure is deficient, provided that it does not prejudice any party. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Hartford will not be prejudiced by including the expert testimony of Peterson. Its motion to exclude is DENIED.

**B. Motion to Strike Portions of the Declaration of Christopher Frost in Support of the Defendant's Motion for Summary Judgment**

Johnson moves to strike portions of the Declaration of Christopher Frost in Support of the Defendant's Motion for Summary Judgment that opine on the proper interpretation of the insurance policy. That is a legal matter reserved for the court. *See In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1264 (9th Cir. 1982) ("The question of interpretation of a contract is a question of law[.]"). This motion is GRANTED.

---

[1] Hartford also argues that Peterson's methodology fails to account for insureds who were, in its opinion, overpaid. For the reasons stated in Section II, this argument is misplaced.

### C. Motion to Strike and Objections to Evidence in Support of Hartford's Reply

Johnson also moves to strike the report of Adrian Frank in support of Hartford's reply to Johnson's opposition to Hartford's motion to dismiss. This report does not rebut any expert of Johnson's; it simply attempts to augment Hartford's reply by attacking a legal argument from Johnson's counsel. It is improper. Under Federal Rule of Civil Procedure 26(a)(2)(D)(ii), a rebuttal expert is appropriate only if the testimony is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." As Johnson did not even offer an expert witness in his opposition, there is nothing to "rebut" and the motion to strike Frank's rebuttal report is GRANTED.[2]

## LEGAL STANDARD

### I. MOTION FOR SUMMARY JUDGMENT

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony

---

[2] In violation of the Local Rules, Hartford's counsel filed a letter to supplement its argument after the hearing. Dkt. No. 62. This unbidden correspondence is STRUCK and counsel is admonished not to attempt ex parte communications in the future without leave of court.

does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

## II.    MOTION TO CERTIFY CLASS

"Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588 (9th Cir. 2012).  The party seeking certification bears the burden of showing that Rule 23 has been met.  *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011); *Conn. Ret. Plans & Trust Funds v. Amgen Inc.,* 660 F.3d 1170, 1175 (9th Cir. 2011), *aff'd,* 133 S. Ct. 1184 (2013).  Rule 23(a) requires that plaintiffs demonstrate numerosity, commonality, typicality and adequacy of representation in order to maintain a class action.  *Mazza,* 666 F.3d at 588.  A Rule 23(b)(3) class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

## DISCUSSION

The crux of Hartford's arguments in both substantive motions is that Johnson cannot show that he has been injured:  Hartford paid him more for ACV than he spent to repair his building.  I analyze the policy and Section 2051 in the standing section below to show that Johnson has alleged an injury in fact.  This disposes of the bulk of Hartford's arguments on summary judgment.  After briefly discussing the remaining issues, I move on to Johnson's class certification motion, find that common questions predominate, and grant certification.

## I.    MOTION FOR SUMMARY JUDGMENT

### A.  STANDING AND SECTION 2051

In order to meet the standing requirements of Article III of the Constitution, a plaintiff must be able show (1) "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992).  Hartford contests only whether Johnson has established an "injury in fact," which is "an invasion of a legally protected

interest" that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id*. at 560. The party claiming jurisdiction bears the burden of establishing standing. *Id*.

       1. The Policy

      Hartford's contention that Johnson cannot establish an "injury in fact" because it has paid him more than it owed him under the policy assumes its own conclusion. The question of how much Hartford owed Johnson is why this suit has been brought. Johnson argues that he has suffered damages because Hartford violated Section 2051 and paid him less than it should have paid him.

      Accordingly, the existence of injury in fact turns in part upon the substantive merits of the case. If Johnson's ACV payment was less than the amount he *should* have received pursuant to the contract, then he has suffered an injury in fact regardless of whether he was paid more than he spent on repairs. "Economic harm based on the 'benefit of the bargain' theory" is sufficient for the purposes of standing." *See, e.g.*, *Thomas v. Costco Wholesale Corp.*, No. 5:12-CV-02908 EJD, 2013 WL 1435292, at *4 (N.D. Cal. Apr. 9, 2013).

      Both Hartford and Johnson insist that the language of the contract favors them. Hartford argues that Johnson's ACV pay-out is limited to the actual cost of repairs to the building. In support of this, Hartford cites to Section 5(c) of the Property Loss Conditions portion of its Special Property Coverage Form:

> ***We will not pay more*** for physical loss or physical damage on a replacement cost basis ***than the least of***:
> (i)    The cost to replace, on the same premises, the physically lost or physically damaged property with property of comparable material and quality and which is used for the same purpose; or
> **(ii)**   **The amount you actually spend that is necessary to repair or replace the physically lost or physically damaged property.**

Mot. 5 (citing to Policy at 3992) (emphasis in original).

      The portion of the policy quoted above is located in a section discussing RCV, not ACV. It applies "on a replacement cost basis." Policy at 3992. The section immediately below addresses ACV:

> If the Actual Cash Value - Buildings option applies, as shown in the

Declarations, paragraph (1) above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

Policy at 3992.

In the event of a "partial loss," such as in the present case, "actual cash value" is determined as

The amount it would cost to repair, rebuild or replace the property less a fair and reasonable deduction for physical depreciation of the components of the building or structure that are normally subject to repair or replacement during its useful life. Physical depreciation is based upon the condition of the property at the time of the loss.

Policy at 4029.

In other words, the ACV is determined prospectively at the time of the loss as an estimate of what it would cost to repair--that is, what it would cost to return the structure to its state prior to the loss. This is distinct from the RCV, which is determined retrospectively, and is paid subsequent to the completion of repairs, in the amount of the actual cost of repairs. The language of these two sections together supports Johnson's position that the total amount recoverable under the policy is not limited to the amount actually spent on repairs.

Hartford advances several counterpoints in its reply. First, it says that the terms of its coverage agreement limit its obligation to pay to the cost of repairs. In support of this, it cites a portion of its Special Property Coverage Form: "We will pay for direct physical loss of or physical damage to Covered Property at the premises described . . . caused by or resulting from a Covered Cause of Loss." Policy at 3972. This is not dispositive, as payment for "direct physical loss" or for "physical damage" is not linked to the actual amount spent on repairs. Rather, it implies payment for the value of the loss, which can be determined either through the amount spent on repairs (RCV) *or* the estimated cost of returning the property to its state prior to the destructive event (ACV).

Second, Hartford restates, without elaborating, its previous argument that "the Policy caps Hartford's liability at the amount actually spent to repair or replace the damaged property." Mot. 7. Again, the "cap" language is in the RCV, not ACV, section of the policy. Hartford's argument does not take into account that its insureds may decide, for a variety of reasons, to take the ACV to which they are entitled and not rebuild all of the structure, as Johnson has apparently done in not

9

rebuilding the third floor.

Finally, Hartford argues that "it defies the very definition of 'actual cash value' to hold that repair costs do not count in this equation." Oppo. 7. On the contrary, excluding the actual cost of repairs from "actual cash value" forms the very basis of the meaning of ACV--otherwise, the term would be indistinguishable from RCV, rendering the "Actual Cash Value - Buildings" section meaningless.

Lacking strong backing from the text of the Policy, Hartford turns to inapposite case law for support. It relies primarily on *Lincoln Fountain Villas Homeowners Ass'n v. State Farm Fire & Casualty Insurance Co.*, 136 Cal. App. 4th 999 ("*Lincoln Fountain*"). Hartford cites that opinion's language that "if the actual cost to repair is less than the actual cash value payment previously received, the insured is not entitled to any additional payment." *Lincoln Fountain*, 136 Cal. App. 4th, at 1007. In that quotation, however, the court was reciting the terms of the policy agreement between the parties in that case, not pronouncing a rule of law. *Id.* ("Under the terms of the Homeowners Association's policy with State Farm . . . ."). Finally, the insured in *Lincoln Fountain* made an RCV claim, not an ACV claim. As a result, wrongfully withheld depreciation was not an issue. That case is not on point.

2. Section 2051

i. Depreciation of Components

Johnson asserts that Hartford violated California Insurance Code section 2051, which provides for the calculation of ACV in the case of a "partial loss" of a building:

> In case of a partial loss to the structure, or loss to its contents, the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less. In case of a partial loss to the structure, a deduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure.

Cal. Ins. Code § 2051(b)(2). In Johnson's view, this provision prohibits "deductions for 'physical depreciation' of structural components that are not normally subject to repair and replacement during the useful life of the structure." Compl. ¶ 7. Accordingly, he asserts that Hartford "unlawfully" depreciated the following components in its ACV payment: baseboards/trim,

cement, doors, drywall, electrical wiring, framing and rough carpentry, insulation, lath and plaster, marble, ornamental iron, plumbing, and stairs. Compl. ¶ 13.

Hartford disagrees. It claims that the "plain language" of Section 2051 contradicts Johnson's interpretation because it does not include or suggest a list of structural components that cannot be depreciated." *Id*. Hartford misses the point.

In construing a statute, the court should seek to "effectuate the law's purpose" by "look[ing] to the statute's words and giv[ing] them their usual and ordinary meaning." *Imperial Merch. Servs., Inc. v Hunt*, 212 P.3d 736, 740 (Cal. 2009). Section 2051 prohibits deductions for "components of a structure that are [not] normally subject to repair and replacement during the useful life of the structure." Ins. Code § 2051(b)(2). In order to "effectuate the law's purpose," there must be *some* number of "components" which fall within the prohibition established by Section 2051. That these components are not enumerated does not mean they do not exist; rather, it means that courts or finders of fact must make determinations in the course of litigation.

Hartford's recitation of the section's legislative history is likewise unpersuasive. It quotes the sponsor of the legislation, who said: "[I]t would be difficult to create a comprehensive list. *It would be more appropriate to approach any questions (on whether a particular property should be depreciated) on a case-by-case basis*." Mot. 15 (emphasis in original). One imagines that this "case-by-case basis" would involve lawsuits such as the one before me. Despite its thorough review of the legislative history of Section 2051, Hartford does not point to any part where the legislature considered and rejected any of the components suggested by Johnson as deserving inclusion in the prohibition.

Although Johnson puts forth a different argument in rebuttal I need not reach it here. *See* Oppo. to Mot. 10-11. Rather, Hartford's lengthy argument regarding the nonexistence of a "pre-set list of certain components" where depreciation is prohibited militates *against* its own motion for summary judgment.

Whether Hartford complied with its own interpretation of the statute also appears to be in dispute. Johnson alleges that Hartford never "looked at whether each specific component was expected to last as long as the specific structure or not," and provides evidence in support of this

11

1    claim. Oppo. to Mot. 14. At the summary judgment stage, I must construe all well-pleaded facts

2    as true. *Anderson*, 477 U.S. at 255. Because there are facts in dispute, summary judgment is

3    inappropriate.[3]

4                    ii.    Depreciation of Sales Tax

5         Johnson claims that Hartford "unlawfully underpays actual cash value by decreasing the

6    sales tax component of actual cash value by the percentage of physical depreciation taken on the

7    claim." Compl. ¶ 14. His objection is to Hartford's current method of ACV calculation, which

8    includes the value of sales tax in the ACV by applying the sales tax to the estimated amount of

9    value lost in the incident. He interprets Section 2051 to require that the value of sales tax included

10   in the ACV payment be computed by reference to the estimated cost of repair rather than by

11   reference to the depreciated value of what was lost. *See* Oppo. 16 (providing an example). He

12   contends that Section 2051 prohibits the depreciation of the sales tax because that section only

13   allows for "physical depreciation," and sales tax is intangible. Oppo. to Mot. 14.

14        Hartford counters that this interpretation is contrary to both Section 2051 and the plain

15   language of the policy. It says that payment of sales tax is contrary to the point of ACV, which is

16   not tied to the actual repair costs of the structure. It concludes that it makes little sense that

17   Johnson should "receive reimbursement for a tax he never incurred." Mot. 17.

18        Hartford's arguments are unpersuasive. Both the policy and Section 2051 prohibit

19   deductions apart from those for "physical depreciation" in calculating the ACV. Ins. Code. §

20   2051(b)(2). This raises the question of whether sales tax should be considered independently or

21   simply as part of the cost of material items. If considered independently, the sales tax constitutes a

22   non-tangible item not subject to deduction at all under Section 2051 or the policy. However, if the

23   sales tax constitutes part of the cost of an item, it can be deducted as part of the "physical

24   depreciation" calculation. *See* Ins. Code. § 2051(b)(2).

25

26   ───────────────
     [3]      This same fact resolves the argument raised by Hartford at the April 19, 2017, hearing that

27   the individualized inquiry required by Section 2051 pertains to *each structure* rather than to each
     structural component. This interpretation runs contrary to the language of the statute, which

28   prohibits depreciation of items not "normally" replaced. Conducting a case-by-case analysis by
     structure rather than by component renders the word "normally" meaningless.

The sales tax is distinct from the physical items and not subject to "depreciation" or deduction. A sales tax is a "tax . . . separately stated and collected on a transaction-by-transaction basis from the consumer; although the economic burden of the sales tax falls upon the consumer, the seller has the statutory duty to collect the tax for the taxing jurisdiction." 68 Am. Jr. 2d *Sales and Use Tax* § 1, at 11 (1993). The cost imposed by the sales tax is discrete from the value of the item being purchased; it is "separately stated *and collected*" from the consumer. *Id*. (emphasis added). Moreover, it is the seller, not the consumer, who carries the responsibility of "collect[ing] the tax," and rendering it to the government.

Including the sales tax with the ACV payments comports with the overall purpose of ACV, which is calculated as "the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury." Ins. Code § 2051(b)(2). If ACV were designed to pay the insured the amount paid to repair or replace the damaged property, Hartford's position would be appropriate. But ACV is calculated as the estimated cost of repair. *Id*. Though constituting an expenditure "independent" of the physical materials required to repair the structure, it is nonetheless part of the "amount it would cost the insured to repair . . . the thing lost." *Id*.; *accord Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1305 (11th Cir. 2008) ("[T]he cost to repair and replace property with new materials would necessarily include the state and local taxes on the materials purchased to make the repairs.") (internal quotation marks omitted).

Calculating the sales tax by reference to the value of the items lost vindicates the point of the insurance, rather than producing a windfall for the insured as Hartford argues. Hartford's only support is an unreported case that does not apply California law, let alone the statute at issue. *Gee v. State Farm Fire Cas. Co.*, 2013 WL 8284483 (N.D. Ill. Sept. 23, 2013). That case involved a similar controversy over the "depreciation" of sales tax in an ACV payment subsequent to a loss, but turned upon Illinois law. It did not consider many of the arguments discussed in this section. And in concluding that including sales tax as calculated by reference to estimated costs of replacement (rather than estimated value of loss) would constitute a windfall for the insured, the *Gee* court emphasized the aim of the policy in that case, which was "to place the property owner

13

in a financial position equivalent to that he would have occupied had his loss not occurred." *Id*. at *2. Putting Johnson in an equivalent "financial position" would not necessarily mean calculating the sales tax on the depreciated loss.

Hartford's remaining argument, that it did not breach its policy "by declining to make [the sales tax] payment before Plaintiff had even incurred this tax," is meritless. The premise of ACV is to provide the payment prior to the insured "incurring" the costs of returning the property to its state prior to the loss. The cases to which Hartford cites do not help it. *Papurello v. State Farm Fire & Cas. Co.*, 144 F. Supp. 3d 746 (W.D. Pa. 2015), turned on Pennsylvania state law, not California law, and, like *Gee*, is unpersuasive. *Id*. at 771. *Tolar v. Allstate Texas Lloyd's Co.*, 772 F. Supp. 2d 825 (N.D. Tex. 2011), weighs against Hartford's position. The *Tolar* court explained that the "ordinary meaning of replacement costs" in the context of ACV is "a composite of all reasonably foreseeable repair or replacement costs, including . . . sales tax." *Id*. at 831-32. This supports the conclusion that sales tax should be calculated by reference to the estimated costs of replacement rather than the depreciated value of the structure at the time of loss.

As a result, I find that Johnson has shown that he has suffered an injury in fact sufficient to establish standing and that his Section 2051 claims--the depreciation of components and the depreciation of the sales tax--survive summary judgment.

## B. BREACH OF CONTRACT

"The elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). In the present case, Hartford contends only that Johnson cannot show damages for the same reasons it contested Johnson's standing. Hartford's argument on this point, therefore, fails as described in I.A, above.[4]

---

[4] The parties also dispute whether Johnson can allege an independent breach of the requirements of California Code of Regulations title 10 § 2695.9(f). In his opposition, Johnson objects that Hartford cannot prevail on summary judgment because it did not address his "claim" under that regulation. But Johnson does not make an independent claim under section 2695.9(f). *See* Compl. 7-11. It is part of his breach of contract claim, and it survives summary judgment. Compl. 7 ("[S]ection 2695.9(f) forms a part of the contract . . . .").

14

## C.  DECLARATORY JUDGMENT

Hartford argues that Johnson lacks standing for declaratory judgment because he cannot show that a decision in his favor would redress the injury.  Hartford bases its argument on its assertion that Johnson lacks any injury to redress because he spent less on repairs than he received under the insurance policy.  For the reasons discussed in I.A. above, this argument is unpersuasive.

Hartford also suggests that Johnson's requests for declaratory relief restate his other claims and should therefore be dismissed.  I do not see how Hartford is prejudiced by these claims and I can foresee some utility if I determine at the end of the case that Hartford has violated Section 2051 on a class-wide basis.  For the moment, I will exercise my discretion and allow the declaratory relief claim to remain.

## D.  BAD FAITH CLAIM

In its motion for summary judgment, Hartford contends that Johnson's bad faith claim fails as a matter of law because there was no breach of contract, and as such there can be no bad faith claim.  It also asserts that if there was breach of contract, there was a reasonable basis for Hartford's claim payment.

Under California law, "without a breach of the insurance contract, there can be no breach of the implied covenant of good faith and fair dealing." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1034 (9th Cir. 2008).  Hartford contends that Johnson "has no viable claim for breach of contract" because he cannot show damages.  As discussed in I.A., above, I disagree.

Hartford also claims that it cannot be held liable for bad faith because there was a "genuine dispute" between it and Johnson.  As Hartford observes, "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with the insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." *Trishan Air, Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 434 (9th Cir. 2011).  This may be true, but "the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact." *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001).  It is only a question of law where "the

1    evidence is undisputed and only one reasonable inference can be drawn from the evidence." *Id*.

2    As a result, making such a determination as a matter of law on a bad faith claim is rarely

3    appropriate for summary judgment.

4        In *Amadeo v. Principal Mutual Life Insurance Co.*, 290 F.3d 1152 (9th Cir. 2002), the

5    Ninth Circuit considered a bad faith claim in the context of summary judgment brought by the

6    insurer. It determined that summary judgment is appropriate only where "it is undisputed or

7    indisputable that the basis for the insurer's denial of benefits was reasonable--for example, where

8    even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability

9    under California law." *Id*. at 1162. Hartford cannot meet that standard.

10       Johnson contends that Hartford unlawfully "depreciated all components of Plaintiff's

11   structural loss without regard to whether the components were normally subject to repair and

12   replacement during the useful life of that structure." Compl. ¶ 13. Accepting that allegation as

13   true, Hartford violated the law even under its own interpretation of Section 2051 and the policy.

14   At a minimum, this raises a factual dispute as to whether it acted unreasonably and in bad faith in

15   this case.

16       **E. UNFAIR COMPETITION LAW CLAIM**

17           1.  Liability

18       Under the Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code § 17200, *et seq*.,

19   "prohibits specific practices which the legislature has determined constitute unfair trade practices."

20   *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999). As a

21   result, a claim under the UCL requires "some violation of substantive law." *Lopez v. Washington*

22   *Mut. Bank, FA*, 302 F.3d 900, 907 (9th Cir.). Hartford argues that, because it did not violate

23   Section 2051, Johnson's unfair competition law claim fails "as a matter of law." Mot. 19. As

24   already explained, Johnson has a plausible claim for violation of Section 2051, and so he has a

25   plausible claim under the UCL.

26           2.  Injunctive Relief

27       Johnson seeks "an order from the Court enjoining [Hartford], and those in concert and

28   participation with it, from conducting or participating in the acts alleged in this Complaint to

violate the [California] Unfair Competition Law ["UCL"] and for the re-adjustment of illegally adjusted claims." Compl. ¶ 52. In addition to the injury in fact argument that I just discussed, Hartford contends that Johnson lacks standing for injunctive relief because he cannot "establish that there is a significant likelihood that he will be harmed *again* in a similar way." Mot. 7 (emphasis in original).

Standing under the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17000 *et seq.*, is "expansive." *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003). Even so, this does not do away with the requirements of Article III. *See, e.g.*, *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012) ("[T]here must be a real and immediate threat of repeated injury" to meet standing requirement for injunctive relief under the UCL.). In order to receive injunctive relief, the party requesting it must show he has "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian Coll. v. Ams.United for Separation of Church & State*, 454 U.S. 464, 472 (1982). The party requesting injunctive relief must also show that he is "realistically threatened by a repetition of the violation." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2011).

Johnson has shown that he and others face such a prospect. While courts differ on what constitutes a realistic threat of repetition, the distinction I made in *Rushing v. Williams-Sonoma, Inc.*, No. 16-CV-01421-WHO, 2016 WL 4269787 (N.D. Cal. Aug. 15, 2016), is instructive here. In *Rushing*, I considered a case in which a manufacturer had falsely labeled the thread counts on the packaging of its bed sheets. The plaintiff sought an injunction ordering the defendant to discontinue this practice. I determined that the plaintiff met the requirements for standing because there was a real threat of future injury. That threat existed because the false labeling would not be immediately apparent to a consumer. As a result, a consumer might purchase the product again under the belief that the advertised thread count was accurate. To discover any discrepancy, she would have to have the product professionally tested.

The *Rushing* situation is distinct from many food products labeling cases where courts

1    have found no standing.  In those cases, a consumer plaintiff would be aware that the product

2    about which she complains contains an unwanted ingredient, such as when complaining that

3    "evaporated cane juice" is sugar.  The present case is more analogous to *Rushing* than the food

4    product cases.  As in *Rushing*, any consumer of Hartford's insurance products would not be able

5    to easily discern whether it was complying with the law.  This includes Johnson--following the

6    conclusion of this case, Johnson would still not be able to know before any loss, absent substantial

7    investigation, whether Hartford changed its depreciation practices.  As a result, Johnson has

8    adequately demonstrated the prospect of future, repeated harm.

9        Hartford argues that Johnson is not "realistically" threatened by future suffer harm,

10   because he would need to not only purchase insurance from Hartford again, but also be so unlucky

11   as to suffer another loss.  Whether he buys from Hartford again is his decision, and he should be

12   able to have confidence that Hartford will obey the law in the future if he shows that it is violating

13   it now.  In addition, the harm would accrue upon the purchase of the insurance, not upon the

14   destruction of the structure.  Insurance offers a sense of security as well as monetary compensation

15   for loss for the insured.  If Hartford continues to unlawfully depreciate items, this necessarily

16   inflicts harm by undermining the purpose of the insurance.

17       Finally, accepting Hartford's reasoning would create a difficult situation for insureds.  If

18   no plaintiff can receive injunctive relief where the defendant is violating state law, the result

19   would be a deterioration of consumer market confidence.  *Cf. Lilly v. Jamba Juice Co.*, No 13-cv-

20   02998-JST, 2015 U.S. Dist. LEXIS 34498, at *14 (N.D. Cal. Mar. 18, 2015) ("Without injunctive

21   relief, [plaintiff] could never rely with confidence on product labeling when considering whether

22   to purchase Defendants' product.").

23       Because Johnson can show a reasonable prospect of future injury, he has standing for

24   injunctive relief under the UCL.  Hartford's motion as to this claim is DENIED. [5]

25

26

27   _____
     [5]    Johnson has withdrawn his request for injunctive relief outside the ambit of the UCL.
28   Because he cannot show any likelihood of repeated, related harm in the future, his request for
     "injunctive relief as warranted" as part of his third cause of action will be STRUCK.

## II.    CLASS CERTIFICATION

Rule 23(a) of the Federal Rules of Civil Procedure requires all putative classes to satisfy four requirements:  (1) The class must be so numerous that joinder of all members would be impracticable ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims of the named party must be typical of those of the class ("typicality"); and (4) the representatives of the class must be able to fairly and adequately represent the interests of the class ("adequacy").  Fed. R. Civ. P. 23(a).  The plaintiff seeking to certify the putative class bears the burden of demonstrating that the proposed class meets these requirements.  *See Doninger v. Pac. Nw. Bell*, 564 F.2d 1304, 1309 (9th Cir. 1977).

In the present case, Johnson brings a motion to certify one class and one subclass.  The proposed class is:

> All California residents insured under a HARTFORD insurance who suffered a partial loss of a covered structure within the applicable statute of limitations period including any period of tolling who was not paid the limits of the applicable coverage and whose indemnity payment for the structure was decreased as a result of depreciation of sales tax and/or one or more of the following structural components:  baseboard/trim, cement/concrete/asphalt, doors, drywall, electrical wiring, fireplace, framing/rough carpentry, insulation, lath and plaster, masonry, marble, ornamental iron, plumbing, stucco, and/or stairs.

Mot. for Class Cert. 3.

He also proposes a subclass comprised of:

> All members of the Proposed Class whose Actual Cash Value payment was reduced by depreciation to one or more of the following structural components and who did not fully recover all depreciation in a subsequent claim for replacement cost value: acoustical ceilings, baseboards, basement floor systems, bath cabinets, brick, ceilings and ceiling suspension, ceramic tile, cement, cement posts, chimneys, closet doors, closet shelves, concrete footings, concrete foundations, custom millwork, drywall, electrical wiring and insulation, engineered wood, exterior siding, fiber cement, fiberglass doors, fireplaces, floor trusses, framing, insulation, laminated strand lumber, lath, mantles, marble, natural stone, natural wood flooring, ornamental iron, plaster, plumbing, poured concrete structural systems, roof trusses, rough carpentry, rough structure, slate flagstone floors, stone, stucco, terrazzo, timber frames, toilets, trim, two-by-four studs, walls, wall panels, wood doors, and wood shutters.

Mot. for Class Cert. 3-4.

Although both parties brief every aspect of class certification extensively, Hartford focuses

its criticism of Johnson's motion on what it believes to be his inability to meet the requirement of predominance. It relies on a misconception of how damages are to be measured--namely, that no damages can exist where an insured has recovered more from Hartford than it expended on repairs. For the reasons I explain below, I disagree with Hartford's objections and find that the class certifiable.

## A. RULE 23(a) REQUIREMENTS

### 1. Standing

"[P]laintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 n.6 (2016) (internal quotation marks omitted). For the reasons discussed above in I.A., Johnson has demonstrated that he "personally [has] been injured" and therefore has standing. *Id*.

### 2. Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Hartford does not challenge Johnson's putative class on this basis. With an estimated 19,500 members, the class Johnson proposes meets this requirement. I also find that the class is ascertainable, as Johnson has set forth clear and objective criteria by which he would identify class members.

### 3. Commonality

In order to meet the requirement of commonality, the plaintiff must demonstrate that there are questions of law and fact common to the class. Fed. R. Civ. P. 23(a)(2). There is no requirement that all questions of fact or law be common to the class. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2009). A question is common to the class if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Although permissive, commonality requires more than alleging any common question--for example, "Were Plaintiffs passed over for promotion?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Rather, commonality requires a question that will produce a "common answer to the crucial

question *why I was disfavored*." *Id.* (internal quotation marks and citations omitted) (emphasis in original).

In the present case, Johnson's class is framed around the common answer of "the plaintiffs were disadvantaged by Hartford's policies of depreciation of parts and sales tax," to the question, "how were the plaintiffs disadvantaged by Hartford?" *Cf. id.* Johnson's causes of action all turn on (1) a determination of whether Insurance Code Section 2051 prohibits Hartford from depreciating certain structural items; (2) if so, what those structural items are; (3) whether Hartford is prohibited by Section 2051 from "depreciating" the sales tax value; and (4) whether Hartford has provided an explanation of its depreciation under Regulation 2695.9(f).

4. Typicality

To show typicality, a plaintiff must demonstrate that the "named parties' claims are typical of the class." Fed. R. Civ. P. 23(a)(3). This means that the class representative "possess[es] the same interest and suffer[s] the same injury" as the other class members. *E. Tex. Motor Freight Sys. v. Rodridguez*, 431 U.S. 395, 403 (1977). The present case meets this requirement. Johnson has suffered the same harm that he alleges the putative class has suffered--reduction in ACV payment via unlawful depreciation. Likewise, Johnson possesses the same interest as the other putative class members--recovery of the difference between the payment from Hartford and the undepreciated ACV.

5. Adequacy

Rule 23(a)(4) requires that the named parties be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet this requirement, the plaintiff must show that (1) the named plaintiffs and their counsel do not have conflicts of interests with other class members, and (2) the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class, which includes a showing that class counsel is competent and qualified. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Johnson is able to meet these requirements.

Johnson is an adequate class representative, and neither he nor his counsel have conflicts of interest with other class members. A class representative is adequate where his "claim and the

class claims are so interrelated that the interests of the Class Members will be fairly and adequately protected in their absence." *Gen. Tel. Cop. of Sw.*, 457 U.S. 147, 157 (1982). As explained, Johnson is typical of his class, and his individual claims are identical to those he brings on behalf of the class.

Hartford's argument that Johnson is an inadequate representative is unconvincing. It rests its position on the supposition that Johnson is "untrustworthy," wholly ignorant of his own case, or both. *See* Oppo. to Mot. for Class Cert. 23-24. The adequacy of a class representative may sometimes turn upon that representative's lack of credibility, *see, e.g.*, *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010), or having turned over the case entirely to his attorneys. *See, e.g.*, *In re Facebook, Inc. PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012). However, these are narrow exceptions and Hartford's contentions of the untrustworthiness of Johnson lack support from the record.

Moreover, Hartford's attacks on Johnson's character are based on the fact that Johnson has brought the present suit. It says that Johnson cannot adequately represent the class because of an uncited and unelaborated claim of "questionable conduct" and because "he cannot provide any evidence showing his claim was underpaid by Hartford." Oppo. to Mot. for Class Cert. 24. This assertion begs the question central to the present case of whether Hartford underpaid Johnson; the very premise of the suit cannot serve as the basis to deny a class certification for inadequate representation.

Hartford's effort to discredit Johnson for his purported lack of knowledge about this case also fails. The "threshold of knowledge required to qualify as a class representative is low"; it is only a bar to certification where the representative if "startlingly unfamiliar" with the case. *E.g.*, *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D. Cal. 2008); *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004). Hartford points out that Johnson was unfamiliar with Section 2051 prior to the filing of the present lawsuit as evidence of Johnson's inadequacy. This is not a problem. "A [representative] party must be familiar with the basic elements of her claim," but does not need to have a full understanding of the legal basis of his claims prior to the filing of the lawsuit. *Californians for Disability Rights*, 249 F.R.D. at 349.

Hartford also claims that Johnson had not read the complaint at the time of his deposition. That may or may not be true, as Johnson corrected his statement at his deposition that he had not read the complaint. Veroff Class Cert. Reply Decl. ¶¶ 5-6, Exhs. D-E. But what is required of a class representative is that he be able to explain the factual basis for the lawsuit and why he believes he was wronged. *See Californians for Disability Rights*, 249 F.R.D. at 349.*; see also Jenkins v. Macatawa Bank Corp.*, No. 1:03-CV-321, 2006 WL 3253305, at *7 (W.D. Mich. Nov. 9, 2006) (explaining that adequacy only requires an ability to articulate "in a general sense" the wrong alleged). Johnson has done so. *See* Veroff Class Cert. Reply Decl. ¶ 4, Exh. C at 12:21-13:6; 27:23-28:12; 81:17-82:4.

Hartford's argument that Johnson has "totally" ceded control of the case to his attorneys relies upon mischaracterization of Johnson's statements at his deposition and a single, decontextualized statement that one of his duties as a class representative is to "follow the directions of my attorney." Frost Class Cert. Decl. ¶ 33. None of this is sufficient to preclude class certification. *See* Robert Klonoff, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION § 3.24 (1999) (explaining that many courts "recognize that clients necessarily look to counsel to understand the factual and legal intricacies" of their class action).

Finally, class counsel is competent and qualified. To determine whether class counsel is adequate, a court looks to: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). As Johnson notes, class counsel have dedicated a substantial amount of time and resources to the present case, and intend to continue to do so. Mot. for Class Cert. 17-18. In addition, class counsel have previously litigated similar class actions. *See Alexander v. Farmers Ins. Co.*, 219 Cal. App. 4th 1183 (2013); *Kirkwood v. Cal. State Auto. Ass'n Inter-Ins. Bureau*, 193 Cal. App. 4th 49 (2011).

Johnson meets the adequacy requirements of Rule 23(a)(4).

**B. RULE 23(b) REQUIREMENTS**

A plaintiff seeking certification of a class must also meet the requirements of Rule 23(b). Under Rule 23(b)(3), a class action may move forward if (1) "questions of law and fact" that are common to the class predominate over those affecting only individual class members ("predominance"), and (2) a class action is "superior" to other available methods ("superiority").

1. Predominance

Hartford focuses its challenge to Johnson's class certification on the issue of predominance. Under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). An "individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (internal quotation marks omitted). In the present case, common questions predominate.

Johnson's claims revolve around Hartford's alleged failure to pay the amount it owes under its insurance contracts to the insured by unlawfully depreciating the value of certain "permanent" items and the sales tax. These questions, which pertain to every class member, can be resolved through the interpretation of one statute, Section 2051, and the same factual determinations, whether certain parts are "normally" replaced.

Hartford advances six counterarguments, none of which are persuasive. First, it contends that because proving a breach of contract requires proving actual damage, individual questions predominate. In Hartford's opinion, each class member must show damages. However, this issue arises only if I accept Hartford's earlier argument that Johnson cannot show damages because he spent less on actual repairs than he was paid. As explained, I disagree; the mere fact that repair has been accomplished does not preclude a finding of damages. The measure of damages is not the difference between the amount of money spent on repairs and what was paid out, but rather the difference between what Hartford paid out and what it should have paid out if not for its

purportedly unlawful practice of depreciation. As a result, proof of damages is not an individualized question at all but rather turns on the class-wide question of whether Hartford violated Section 2051 through its practices of depreciation.

Second, Hartford invokes *Newell v. State Farm General Insurance Co.*, 13 Cal. Rptr. 3d 343 (Cal. Ct. App. 2004). *Newell* does not help it. In that case, plaintiffs alleged that the insurer employed bad faith practice in the way it adjusted insurance claims. *Id*. at 350. The *Newell* court found that individual issues would predominate because the case would necessitate "an individual assessment" of the property of each class member. *Id*. This is not so here. Johnson does not contest the underlying assessment, but rather the subsequent depreciation of the assessed value. All that need be determined in the present case is whether Hartford complied with Section 2051 in its depreciation of the ACV and, as a result, underpaid those in the putative class.

Third, Hartford provides a list of cases that it claims support its argument. These are likewise unconvincing because they involved situations where insurance companies did not use standardized practices that were common to the class or otherwise turned on an "individualized inquiry." *See, e.g., Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779-80 (denying class certification because health insurer looked to "whether a provider's charge was usual and customary and, thus, whether the claim payment was reasonable"); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 891 (7th Cir. 2011) (denying class certification where insurer employed an "ad hoc" adjustment standard); *Kraetsch v. United Serv. Auto. Ass'n*, No. 4:14-cv-265-CEJ, 2015 WL 1457015, *5 (E.D. Mo. Mar. 30, 2015) (denying class certification because determination of liability rested on whether "the putative class members paid their premiums on time," and the "kind of water damage" and kind of stucco used).

Fourth, Hartford objects that Johnson's method of determining damage is deficient. Johnson proposes that the damages be measured as the amount of depreciation taken, as indicated in Hartford's records. *See* Mot. to Certify Class 20. Hartford complains that its database does not reflect "other additions" such as "asbestos abatement cost." Oppo. to Mot. to Certify Class 16. This is irrelevant, as those "other additions" would have been excluded regardless of whether Hartford had unlawfully depreciated the ACV or sales tax. This does not impact damages in any

way.

Fifth, Hartford suggests that there can be no predominance of common issues because of its unelaborated legal conclusion that "[e]very class member's policy provided coverage on a replacement cost basis." Oppo. to Mot. for Class Cert. 18. It concludes that the present action will have individual issues that predominate because there will need to be a factual inquiry concerning each member's decision "not [to] take advantage of the contractual right to *full* replacement cost." Oppo. to Mot. for Class Cert. 18. As explained, the amount of money putative class members did or did not spend on repairs is irrelevant to Johson's theory of the case; what matters is the amount of the payment Hartford provided to them and the amount it would have provided but for its depreciation.

Finally, Hartford contends that the bad faith claims in particular are not appropriate for a class action. Oppo. to Mot. for Class Cert. 19. It suggests that in a bad faith analysis, "the focus shifts from breach of contract to the reasonableness of the insurer's actions under all of the circumstances existing at the time." Oppo. to Mot. for Class Cert. 19. It concludes that there can be no predominance of common questions because the court would have to examine Hartford's actions as to *each claim*. I disagree: The actions in question concern Hartford's decision to adopt and apply its present depreciation policy, and whether that policy violates Section 2051. There is no need to look to Hartford's actions on an individual basis.

### 3. Superiority

To proceed with a class action under Rule 23(b)(3), a plaintiff must also show that a class action is a "superior" means of adjudicating the claims. Fed. R. Civ. P. 23(b)(3). In making this determination, a court may take into consideration: (1) "class members' interests in individually controlling the prosecution or defense of separate actions," (2) "the extent and nature of nay litigation" regarding the "same controversy"; (3) the "desirability or undesirability" of litigating all claims in the same forum; and (4) the "likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). I find that these factors favor certification.

The first factor, which considers the class members' interest in pursuing individual actions, weighs in favor certification. "Where damages suffered by each putative class member are not

26

large, this factor weighs in favor of certifying a class action." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.). In *Zinser*, plaintiffs sought to certify a class alleging minimum damages of $50,000 per class member. The court denied certification because, while "a party with a claim of $50,000 might have a difficult time alone pursuing a complex products liability case," the fact that $50,000 was the *minimum* amount alleged did not support certification. *Id*. at 1191. In the present case, Johnson asks for $30,000 in damages, in addition to punitive damages and attorneys' fees. Compl. ¶¶ 13, Prayer for Relief j, k. This is far less than the amount demanded in *Zinser*. The *Zinser* court acknowledged that if only $50,000 in damages was sought, that amount would support certification. *Zinser*, 253 F.3d at 1191. Johnson seeks substantially less.

The cases Hartford cited do not support any finding that $30,000 is so high as to make individual action "superior" to a class action. In *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009), the Eleventh Circuit addressed whether the district court had abused its discretion in failing to consider the 23(b)(3) factors, and concluded that it had. The *Vega* court made only the most passing mention of a substantive superiority analysis. It provides no guidance concerning the amount of damages that weighs against certification. Hartford's citation to *Achizger v. IDS Property Casualty Insurance Co.*, No. C14-5445 BHS, 2016 WL 1276048, (W.D. Wash. Apr. 1, 2016), is also unhelpful; that case addressed an area of law specific to vehicle insurance ("diminished value" suits) and involved only passing reference to the amount of damages sought per class member. *Id*. at *5. Finally, Hartford cites again to *Newell*, which also does not support its position. There, the court did not address the amount of damages per class member at all; it merely noted that the putative class members were all homeowners whose homes were damaged in the Northridge earthquake. 13 Cal. Rptr. 3d at 351.

The remaining factors all support class certification. No other suits have been brought involving the same subject matter as the present action. *See* Mot. for Class Cert. 21. This indicates that individual parties are either unable or unwilling to seek individual litigation on their own behalf, and supports certification. There is also a substantial advantage to concentrating this litigation in a single forum. The present case turns on an interpretation of Section 2051; this will

27

involve a determination as to what items are "normally" replaced during the lifetime of a structure. A situation in which numerous lawsuits surrounding the same question of what items are "normally" depreciated, in which each court must make a determination, would produce confusion and uneven and inequitable results. Finally, there are no foreseeable difficulties in managing this particular class action as opposed to any other.

As a result, I find the superiority requirement of Rule 23(b)(3) to be satisfied, and certify the class.

## CONCLUSION

Hartford's motion for summary judgment is DENIED in large part as set forth above. Material facts are in dispute over Hartford's liability to Johnson, if any, and the record does not establish as a matter of law that Hartford's interpretation of its policy is correct.

Johnson's motion for class certification is GRANTED. Common questions predominate.

Hartford's motion to exclude the testimony of Eugene Peterson is DENIED; Johnson's motion to strike portions of the Frost Declaration is GRANTED; and Johnson's motion to strike the rebuttal report of Adrian Frank is GRANTED.

A case management conference is set for June 20, 2017 at 2:00 P.M. A Joint Case Management Statement is due June 13, 2017; it should include the parties' proposals for a case schedule through trial.

**IT IS SO ORDERED.**

Dated: May 22, 2017

William H. Orrick
United States District Judge